**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A13-0931**

State of Minnesota,
Respondent,

vs.

Todd Eugene Trahan,
Appellant.

**Filed October 13, 2015**
**Reversed and remanded**
**Halbrooks, Judge**
**Dissenting, Ross, Judge**

Ramsey County District Court
File No. 62-CR-12-8574

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John J. Choi, Ramsey County Attorney, Thomas R. Ragatz, Assistant County Attorney, St. Paul, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Chutich, Presiding Judge; Halbrooks, Judge; and Ross, Judge.

**S Y L L A B U S**

1.     When a warrantless search of a driver's blood would not have been constitutional under an exception to the warrant requirement, charging the driver with violating Minn. Stat. § 169A.20, subd. 2 (2012), for refusing to submit to a blood test implicates a fundamental right.

2.      Because Minn. Stat. § 169A.20, subd. 2, as applied to refusal of a warrantless blood test is not narrowly tailored to serve a compelling government interest, it violates a driver's right to due process under the United States and Minnesota Constitutions.

## O P I N I O N

**HALBROOKS**, Judge

On remand from the Minnesota Supreme Court in this combined direct and postconviction appeal, appellant challenges his conviction of first-degree test refusal, arguing that criminalizing refusal to submit to a warrantless blood test is unconstitutional under the rule announced in *Missouri v. McNeely*, 133 S. Ct. 1552 (2013). Because we conclude that conducting a warrantless blood test would have been unconstitutional, charging appellant with a crime based on his refusal to submit to the test implicates his fundamental right to be free from unconstitutional searches. And because the test-refusal statute as applied is not narrowly tailored to serve a compelling government interest, it fails strict scrutiny and violates appellant's right to due process under the United States and Minnesota Constitutions. Accordingly, we reverse and remand for withdrawal of appellant's guilty plea.[1]

## FACTS

Just after midnight on October 24, 2012, a Ramsey County sheriff's deputy stopped appellant Todd Trahan based on his erratic driving and speed. When the deputy

---

[1] We note that neither Minn. Stat. § 609.035 (2012) nor the double-jeopardy clause bars retrial under an amended complaint. *State v. Schmidt*, 612 N.W.2d 871, 876 (Minn. 2000).

2

approached the car, Trahan was screaming that he would be "looking at doing 67 months." The deputy observed that Trahan was agitated, smelled strongly of alcohol, had red and watery eyes, and had difficulty standing up. A check of Trahan's driving record revealed that his license was cancelled as inimical to public safety based on multiple previous driving-while-impaired (DWI) convictions. Because Trahan was "so agitated and unpredictable," the deputy did not administer field sobriety tests.

At the jail, Trahan was read the implied-consent advisory, and he asked for his cell phone to contact an attorney. At 1:53 a.m., after making several phone calls, Trahan stated that he was finished with the phone. The deputy offered Trahan a blood test or a urine test, and Trahan chose urine. The parties' accounts differ on Trahan's compliance with providing a urine sample. Trahan contends that he provided a valid urine sample, but the deputy deemed his conduct a refusal.[2] The deputy then asked Trahan to take a blood test, which he refused.

The state charged Trahan with first-degree refusal to submit to a chemical test in violation of Minn. Stat. § 169A.20, subd. 2. The prosecutor agreed to a sentence at the low end of the presumptive range, and Trahan pleaded guilty. Trahan testified in his plea colloquy that he had provided an adequate urine sample, but acknowledged that the deputy stated that the sample did not "look right" and that Trahan "must have tampered with it." Trahan further testified, "I did refuse the blood test, so I'm guilty of that." The

---

[2] According to the complaint, after several attempts, Trahan failed to provide a sufficient urine sample, and instead put water from the sink into the sample bottle.

3

district court sentenced Trahan to 60 months in prison, a downward departure from the presumptive sentencing range of 65-84 months.

Trahan then filed a direct appeal but requested a stay pending postconviction proceedings, which we granted. In his postconviction petition, Trahan argued that (1) his plea was invalid because the factual basis did not support a refusal to test and (2) the test-refusal statute is unconstitutional because it violates due process and the doctrine of unconstitutional conditions. The district court denied Trahan's petition, determining that (1) Trahan's acknowledged refusal to submit to an alternative test requested by the police supported his guilty plea and (2) Trahan did not meet his burden of establishing the unconstitutionality of the test-refusal statute beyond a reasonable doubt. After reinstating Trahan's appeal, we affirmed. *State v. Trahan*, No. A13-0931 (Minn. App. Sept. 29, 2014).

On December 16, 2014, the supreme court granted Trahan's petition for further review with respect to the constitutionality of the test-refusal statute and stayed review pending its decision in *State v. Bernard*, 859 N.W.2d 762 (Minn. 2015). On April 28, 2015, the supreme court reversed our holding on the constitutionality of the test-refusal statute and remanded to this court for reconsideration of that issue in light of *Bernard*. The parties then submitted supplemental briefing. On remand, Trahan focuses his constitutional argument on substantive due process.

## ISSUE

Does the test-refusal statute violate appellant's right to due process by criminalizing his refusal to submit to a warrantless test of his blood?

4

**ANALYSIS**

Minnesota's test-refusal statute makes it a crime to refuse to submit to a chemical test of blood, breath, or urine administered to detect the presence of alcohol under certain conditions. Minn. Stat. § 169A.20, subd. 2. These conditions include when the person has been lawfully placed under arrest for driving while impaired and an officer has read the person the implied-consent advisory. Minn. Stat. §§ 169A.20, subd. 2, .51, subds. 1-2 (2012). Trahan argues that the test-refusal statute as applied to him violates his right to substantive due process because it criminalizes his refusal of an unconstitutional search of his blood.

### A.      The Fourth Amendment

Because Trahan's due-process argument is premised on a Fourth Amendment violation, we first consider whether a warrantless blood test would have been reasonable under the Fourth Amendment. *See Bernard*, 859 N.W.2d at 766. A blood draw is a search. *See Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616-17, 109 S. Ct. 1402, 1412 (1989); *State v. Brooks*, 838 N.W.2d 563, 568 (Minn. 2013), *cert. denied*, 134 S. Ct. 1799 (2014). The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." U.S. Const. amend. IV.

"The ultimate measure of a permissible government search under the Fourth Amendment is reasonableness." *Bernard*, 859 N.W.2d at 766 (quotation omitted). "A warrantless search is generally unreasonable, unless it falls into one of the recognized

5

exceptions to the warrant requirement." *Id.* It is the state's burden to establish an exception to the warrant requirement. *State v. Ture*, 632 N.W.2d 621, 627 (Minn. 2001). When evaluating whether a warrant exception applies to a given search, courts assess "on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Riley v. California*, 134 S. Ct. 2473, 2484 (2014) (quotation omitted). Two exceptions to the warrant requirement—search incident to a lawful arrest and exigent circumstances—are relevant to our analysis.

### 1. Search Incident to Arrest

"A search incident to a lawful arrest is a well-recognized exception to the warrant requirement under the Fourth Amendment." *Bernard*, 859 N.W.2d at 766. The search-incident-to-arrest exception historically derives from concerns over officer safety and evidence preservation. *See Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 1716 (2009). This exception permits police "to conduct a 'full search of the person' who has been lawfully arrested." *Bernard*, 859 N.W.2d at 767 (quoting *United States v. Robinson*, 414 U.S. 218, 235, 94 S. Ct. 467, 477 (1973)).

Our supreme court recently applied the search-incident-to-arrest exception to conclude that a warrantless *breath* test would be constitutional. *Id.* at 772. The supreme court carefully limited its conclusion to breath tests:

> [T]he question of a blood or urine test incident to arrest is not before us, and we express no opinion as to whether a blood or urine test of a suspected drunk driver could be justified as a search incident to arrest. The differences between a blood

6

> test and a breath test are material, and not the least of those differences is the less-invasive nature of breath testing.

*Id.* at 768 n.6.

Trahan argues, and the state does not dispute, that a warrantless blood test would not be justified under the search-incident-to-arrest exception. We agree. A blood draw is undeniably intrusive: a needle is inserted into the skin to extract blood. In *Schmerber v. California*, the United States Supreme Court explicitly recognized that the search-incident-to-arrest exception has "little applicability with respect to searches involving intrusions beyond the body's surface." 384 U.S. 757, 769, 86 S. Ct. 1826, 1835 (1966). Again in *McNeely*, although not explicitly addressing the search-incident-to-arrest exception, the Supreme Court reiterated the significance of review by a "neutral and detached magistrate" before "invad[ing] another's body in search of evidence of guilt." 133 S. Ct. at 1558 (quotation omitted).

As *Bernard*, *Schmerber*, and *McNeely* highlight, blood draws are serious intrusions into the human body that implicate a person's "most personal and deep-rooted expectations of privacy." *Id.* (quotation omitted). Unlike breath, blood does not naturally and regularly exit the body. And under Minnesota's DWI law, a blood draw can only be performed by a qualified medical professional. Minn. Stat. § 169A.51, subd. 7(a) (2012). This physical penetration makes a blood test far more intrusive than a breath test or other searches of the person that Minnesota courts have upheld as searches incident to a valid arrest. *See Bernard*, 859 N.W.2d at 767 (listing searches of the person justified under the search-incident-to-arrest exception).

7

Because a blood test here would have been highly intrusive, we conclude that a warrantless search of Trahan's blood would not have been constitutional under the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement.[3]

### 2.    Exigent Circumstances

We next consider whether police could have conducted a warrantless search of Trahan's blood under the exigent-circumstances exception to the warrant requirement. The relevant inquiry in applying the exigent-circumstances exception "is whether, under all of the facts reasonably available to the officer at the time of the search, it was objectively reasonable for the officer to conclude that he or she was faced with an emergency, in which the delay necessary to obtain a warrant would significantly undermine the efficacy of the search." *State v. Stavish*, ___ N.W.2d ___, ___, 2015 WL 4930090, at *6 (Minn. Aug. 19, 2015).

In *Schmerber*, the Supreme Court applied the exigency exception to a warrantless, nonconsensual blood draw from an injured driver who was suspected of driving under the influence. 384 U.S. at 770-71, 86 S. Ct. at 1835-36. The Supreme Court held that the warrantless blood draw was justified because exigent circumstances existed, particularly because "time had to be taken to bring the accused to a hospital and to investigate the scene of the accident" and police had "no time to seek out a magistrate and secure a warrant." *Id*. at 770-71, 86 S. Ct. at 1836.

---

[3] The state urges us to conclude that Trahan refused the urine test by conduct and that a urine test would have been constitutional as a search incident to arrest. We decline to consider on this record whether a nonconsensual urine test would have been constitutional because the factual basis for Trahan's guilty plea does not establish the elements of first-degree test refusal in that regard.

8

The Supreme Court revisited the exigency exception in the context of nonconsensual blood draws in *McNeely*, holding that "in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." 133 S. Ct. at 1568. Instead, the Supreme Court concluded that the natural dissipation of alcohol was a *factor* that could support a finding of exigent circumstances and that exigency "must be determined case by case based on the totality of the circumstances." *Id.* at 1556, 1563. The Supreme Court was not asked to decide in *McNeely* whether the totality of the circumstances of that case would justify a warrantless, nonconsensual blood draw under the exigent-circumstances exception. *Id.* at 1567.

Our supreme court recently addressed the exigency exception in the context of a warrantless blood test of a suspected drunk driver and concluded that the search was reasonable under the totality of the circumstances. *Stavish*, 2015 WL 4930090, at *6. In *Stavish*, police had reason to believe that the driver of a vehicle involved in a rollover crash had consumed alcohol and that alcohol had contributed to the crash. *Id.* It was therefore important to draw his blood within the two-hour statutory time frame to ensure the reliability and admissibility of the evidence. *Id.* (citing Minn. Stat. § 169A.20, subd. 1(5) (2012) (providing for measurement of alcohol concentration within two hours of driving)). The driver had sustained serious injuries requiring emergency medical treatment and would potentially be airlifted to a different medical center. *Id.* Because the driver's "medical condition and need for treatment rendered his future availability for a blood draw uncertain," our supreme court concluded that "it was objectively reasonable

9

for [the officer] to conclude that he was faced with an emergency in which the delay necessary to obtain a warrant threatened the destruction of evidence." *Id.* Exigent circumstances therefore justified the warrantless blood draw. *Id.*

Here, Trahan's future availability for a blood draw was not in question. Rather, the "exigency" was the expiration of the statutory time frame while Trahan was arrested, taken to the jail, read the implied-consent advisory, made phone calls, and produced a questionable urine sample. The state argues that under the particular facts of this case, exigent circumstances would have justified a warrantless blood test. We disagree.

Trahan's lack of cooperation throughout the process, while understandably frustrating to police, simply did not create an exigency. The exigent circumstances in *Schmerber* and *Stavish* prevented police from seeking, or delaying the blood draw to secure, a search warrant. *See Schmerber*, 384 U.S. at 770-771, 86 S. Ct. at 1836; *Stavish*, 2015 WL 4930090, at *6. In contrast, the totality of the circumstances here shows no emergency that diminished the likelihood that a valid blood test could be performed after securing a warrant.

The circumstances here are more akin to a routine impaired-driving arrest: the record indicates that Trahan was agitated and difficult. These circumstances fall within "those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn." *McNeely*, 133 S. Ct. at 1561. Because no exigency would have prevented police from seeking a warrant before conducting a blood test, we conclude that a warrantless blood test would not have been constitutional under the exigent-circumstances exception to the Fourth Amendment's warrant requirement.

10

## B.  Substantive Due Process

Having determined that a warrantless search of Trahan's blood would not have been constitutional under the search-incident-to-arrest or exigent-circumstances exceptions to the Fourth Amendment's warrant requirement, we next turn to Trahan's substantive due-process challenge to the test-refusal statute.  "The constitutionality of a statute is a question of law that we review de novo." *State v. Ness*, 834 N.W.2d 177, 181 (Minn. 2013) (quotation omitted).

The Due Process Clauses of the United States and Minnesota Constitutions prohibit the state from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1; *see also* Minn. Const. art. I, § 7.  The Due Process Clause protects against government infringement on certain fundamental rights, "regardless of the procedures provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Chavez v. Martinez*, 538 U.S. 760, 775, 123 S. Ct. 1994, 2005 (2003).  Fundamental rights and liberties are "deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty."  *Id.* (quotations omitted).

Every citizen has a fundamental right to be free from unreasonable searches.  U.S. Const. amend. IV; Minn. Const. art. I, § 10; *see also New York v. Class*, 475 U.S. 106, 123, 106 S. Ct. 960, 970-71 (1986) ("The Fourth Amendment guarantees the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.  This fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer." (quotations

11

omitted)). Because a warrantless search of Trahan's blood would have been unconstitutional under these circumstances, Trahan's fundamental right to be free from unreasonable searches is implicated. *Cf. Bernard*, 859 N.W.2d at 773 ("Having decided that the search of Bernard's breath would have been constitutional, we find no fundamental right at issue here, as Bernard does not have a fundamental right to refuse a constitutional search.").

We therefore subject the test-refusal statute to strict scrutiny. When a statute is subject to strict scrutiny, it is not entitled to any presumption of validity. *In re Welfare of Child of R.D.L.*, 853 N.W.2d 127, 133 (Minn. 2014) (applying strict-scrutiny review to termination-of-parental-rights statute because right to parent is a fundamental right). Rather, the state must meet a heavy burden of showing that the statute is narrowly tailored to serve a compelling government interest. *Id.*

It is well settled that the state has a compelling interest in highway safety that justifies efforts to keep impaired drivers off the road. *See Bernard*, 859 N.W.2d at 773. This interest is substantial. "Indeed, 30 percent of traffic deaths in Minnesota in 2013 were alcohol-related." *Id.* But to survive strict scrutiny, the test-refusal statute—to the extent it criminalizes the refusal to submit to a warrantless blood test—must also be narrowly tailored. A narrowly tailored law is "neither overinclusive nor underinclusive; rather, it must be precisely tailored to serve the compelling state interest." *R.D.L.*, 853 N.W.2d at 135 (quotation omitted).

The state has other viable options to address drunk driving. Police may offer a breath test to a suspected drunk driver and then, if the test is refused, the state may charge

the person with the crime of test refusal. *Bernard*, 859 N.W.2d at 774. The state may also prosecute a driver for driving under the influence without measuring the alcohol concentration or amount of controlled substances in a person's blood. *See* Minn. Stat. § 169A.20, subd. 1(1)-(2) (2014). And when time allows, police can secure a search warrant to test the person's blood.[4] With a valid warrant in place (or an exception to the warrant requirement), the requested test would be a constitutionally reasonable search. U.S. Const. amend. IV; Minn. Const. art. I, § 10. Charging a suspected drunk driver with refusing a constitutional search does not offend due process. *Bernard*, 859 N.W.2d at 772-73.

We conclude that criminalizing the refusal to submit to a warrantless blood test "relates to the state's ability to prosecute drunk drivers and keep Minnesota roads safe," *Bernard*, 859 N.W.2d at 774, but it is not precisely tailored to serve that compelling state interest. It therefore fails strict-scrutiny review.

We recognize that the available alternatives may not be as efficient as the current procedure under the test-refusal statute. But these alternatives serve the state's compelling interest in securing the safety of its roadways *without* infringing on a driver's fundamental right to refuse an unreasonable search of his blood. Because the test-refusal statute as applied fails strict scrutiny, Trahan's right to due process under the Minnesota and United States Constitutions was violated.

---

[4] We note that procedural rules permit search warrants to be secured remotely under certain conditions. *See* Minn. R. Crim. P. 36.01-.08.

13

The state urges us to affirm Trahan's conviction by applying the good-faith exception to the exclusionary rule that our supreme court recently adopted in *State v. Lindquist*, ___ N.W.2d ___, ___, 2015 WL 4928147, *11 (Minn. Aug. 19, 2015). We decline to do so.

The constitutionality of the test-refusal statute depends in part on whether a warrantless, nonconsensual search would have violated the Fourth Amendment. *Bernard*, 859 N.W.2d at 772. The exclusionary rule is a remedy, "which is a separate, analytically distinct issue from whether a constitutional violation occurred." *Lindquist*, 2015 WL 4928147, at *8 (quotation omitted). And Minnesota's recently adopted good-faith exception to the exclusionary rule is a narrow exception. *Id.* at *11. We decline to extend the *Bernard* analysis to the admissibility of evidence that could have been collected in an unconstitutional search that did not occur.

## D E C I S I O N

Because the test-refusal statute as applied to appellant violates his right to substantive due process by criminalizing his refusal of an unconstitutional search, appellant's conviction must be reversed.

**Reversed and remanded.**

14

**ROSS**, Judge (dissenting)

I respectfully dissent from the majority's conclusion that the test-refusal statute violates substantive due process for two reasons, one fundamental and one specific. First, I disagree fundamentally with the assumed premise that has been accepted in some recent test-refusal cases, including *Bernard*, that the United States Supreme Court decision in *Missouri v. McNeely* provides suspected drunk drivers a legitimate substantive due process challenge to the state's chemical test-refusal criminal statute. Second, recognizing that we are nonetheless bound to accept that premise in light of *Bernard*'s reasoning, I also disagree with the majority's conclusion that the test-refusal statute is not narrowly tailored to achieve the state's compelling interest.

### *Criminalizing a suspected impaired driver's chemical test refusal does not trigger strict scrutiny.*

Recognizing that we are bound to follow *Bernard*'s rationale, I merely note that I fundamentally disagree that the United States Supreme Court decision in *Missouri v. McNeely* elevates to the level of strict scrutiny a substantive due process challenge to the state's chemical test-refusal criminal statute.

I am convinced that *McNeely* neither expressly nor implicitly stands for anything beyond its two-tier holding. Its first-tier holding informs us that police cannot, without a warrant or an exception to the warrant requirement, forcibly draw blood from a suspected drunk driver under the Fourth Amendment. *Missouri v. McNeely*, 133 S. Ct. 1552, 1558 (2013). And its second-tier holding establishes

that the biological circumstance of alcohol naturally dissipating from an impaired driver's body is not iteslf an exigent circumstance that allows police to draw the driver's blood without a warrant. *Id*. at 1563. Reading more into *McNeely*—particularly, the notion that a state violates the Due Process Clause if it punishes suspected impaired drivers for refusing to submit to a chemical test under the state's impaired-driving law—exaggerates *McNeely*'s reach.

*McNeely* involved an actual nonconsensual search. As such, it answers whether the search in that case—a nonconsensual blood draw—was permissible under the Fourth Amendment. It answers nothing more. And its reasoning does not undermine the Supreme Court's consistent recognition that states can punish suspected drunk drivers for refusing to be tested for drug and alcohol use. Even while the *McNeely* Court was declaring that states cannot conduct a forced search after a chemical-test refusal, it paradoxically reaffirmed the idea that states can nevertheless punish a suspected drunk driver who refuses to comply with a lawful request for a chemical test. Supporting its holding that the Fourth Amendment prohibits Missouri from warrantlessly drawing blood from a suspected drunk driver without his consent and without exigent circumstances, the *McNeely* Court highlighted several alternatives to warrantless, nonconsensual blood draws, and it expressly described these alternatives as "legal" (that is, *constitutional*). *Id.* at 1566. The Court reminded us that, among other *constitutional* penalties that states can employ to secure chemical-test evidence in drunk-driving cases, a state does not violate a defendant's Fifth Amendment rights by urging a jury to infer from a

defendant's refusal to submit to chemical testing that he is guilty of the crime of drunk driving. *Id.* The *McNeely* Court approvingly cited *South Dakota v. Neville*, 459 U.S. 553, 563–64, 103 S. Ct. 916, 922–23 (1983). Although *Neville* is not a Fourth Amendment case, *McNeely* certainly is. And it is in applying the Fourth Amendment that *McNeely* expressly reminds us through *Neville* that a state can *constitutionally* rely on the driver's test refusal (that is, the driver's exercise of his Fourth Amendment right not to be blood-tested without consent and without a warrant) as circumstantial evidence on which a jury could *convict the driver of a crime*. In other words *McNeely* establishes that a *criminal* conviction arising in part from a driver's chemical-test refusal is not unconstitutional simply because the Fourth Amendment would have prohibited the state from forcing that same driver to submit to the chemical test.

The Supreme Court's recognition that states can constitutionally rely on a driver's test refusal to convict that driver of the crime of drunk driving implies strongly that, even though a nonconsensual chemical test is a "search" under the Fourth Amendment, due process is not offended when the state criminally punishes test refusal as a crime in itself. This recognizes that the right to refuse testing for drunk driving is different in nature from other rights. Notice for example that, by contrast, due process would never allow a jury to infer a defendant's guilt for refusing to consent to a search in the traditional, non-drunk-driving setting. *See, e.g.*, *United States v. Runyan*, 290 F.3d 223, 249 (5th Cir. 2002) ("[T]he circuit courts that have directly addressed this question have

unanimously held that a defendant's refusal to consent to a warrantless search may not be presented as evidence of guilt."); *United States v. Thame*, 846 F.2d 200, 206–07 (3rd Cir. 1988) (holding the same but adding by contrast that a defendant's decision to exercise his Sixth Amendment right to counsel cannot serve as evidence of guilt); *State v. Larson*, 788 N.W.2d 25, 32–33 (Minn. 2010) (holding that a court erroneously admits as evidence of guilt a defendant's refusal to undergo voluntary DNA testing); *State v. Jones*, 753 N.W.2d 677, 687 (Minn. 2008) (noting that it would be improper for prosecutor to comment on defendant's refusal to give saliva sample). That the Supreme Court in *McNeely* buttressed its Fourth Amendment holding on the states' "legal" authority to rely on test refusals to convict drivers of a crime significantly undermines the notion that the Minnesota criminal test-refusal statute is subject to invalidation by the Fourth Amendment's intersection with the Due Process Clause. It is an anomaly in law that *the right to refuse chemical testing* does not include *the right not to be penalized for the refusal*, but it is a reasonable anomaly given the unique nature of the underlying crime.

For the reasons I stated previously in our unpublished opinion in *State v. Chasingbear*, given the Supreme Court's deferential approach to the states' authority to penalize suspected impaired drivers for test refusals, I do not agree that Minnesota's test-refusal statute invites a strict-scrutiny analysis. No. A14-0301, 2014 WL 3802616 (Minn. App. Aug. 4, 2014), *review denied* (Minn. Apr. 14, 2015). It is true that we strictly scrutinize a challenged law that implicates a

fundamental right. *Essling v. Markman*, 335 N.W.2d 237, 239 (Minn. 1983). And we will uphold such a law under strict scrutiny only if it serves a compelling state interest and is narrowly tailored to serve that interest. *See id.* But when a challenged statute does not implicate a fundamental right, it violates substantive due process rights only if, under a rational-basis test, the challenger establishes that the statute is not reasonably related to a legitimate governmental interest. *See Reno v. Flores*, 507 U.S. 292, 305, 113 S. Ct. 1439, 1448–49 (1993); *In re Individual 35W Bridge Litigation*, 806 N.W.2d 820, 830 (Minn. 2011).

Applying the reasoning of the state supreme court decision in *Bernard*, the majority concludes that a fundamental, Fourth Amendment right is at stake here. As I have stated, I believe that no Fourth Amendment right is implicated here because, unlike in *McNeely*, no search occurred. I think we should instead decide more specifically whether a suspected impaired-driver's refusal to submit to chemical testing is itself a fundamental right. The caselaw informs us how to approach that question. The United States Supreme Court has explained, "[W]e have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21, 117 S. Ct. 2258, 2268 (1997) (quotations omitted). If one accepts the reasoning of *Bernard*, the question would be very broadly stated—Does a person have a fundamental right to refuse to

consent to a warrantless search? And if this is the question, I would agree the answer is, yes, a fundamental right is at stake even if the Fourth Amendment is not directly implicated. If, however, the question is more narrowly stated—Does a suspected impaired driver have a fundamental right to refuse a chemical test that will reveal the precise quantity of alcohol and drugs in his body?—I am convinced that one must say no, a fundamental right is not at stake.

The narrow approach to defining the right is the correct approach. The Supreme Court has "required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest." *Id.* at 721, 117 S. Ct. at 2268; *see also McDonald v. City of Chicago*, 561 U.S. 742, 797, 130 S. Ct. 3020, 3053–54 (2010) (Scalia, J., concurring) (explaining that under the due process framework the Supreme Court has "sought a careful, specific description of the right at issue in order to determine *whether that right, thus narrowly defined, was fundamental*"). In *Glucksberg*, the Supreme Court rejected the court of appeals' framing of the issue broadly as "'whether there is a liberty interest in determining the time and manner of one's death'" or "'is there a right to die?'" and instead framed it narrowly as "whether the 'liberty' specially protected by the Due Process Clause includes a right to commit suicide which itself includes a right to assistance in doing so." *Glucksberg*, 521 U.S. at 722–23, 117 S. Ct. at 2268–69.

I believe we should follow the Supreme Court's lead, narrowly rather than broadly construing the right to be tested here. And narrowly construed, the right at stake is the right of suspected impaired drivers to refuse to submit to chemical

testing for alcohol content. No one can say that this is a right deeply rooted in national history and tradition. Far from it: to the extent history and tradition illuminate the subject, they embrace state impaired-driving laws that prohibit impaired-driving suspects from refusing police requests for chemical testing, and they do so in the implied-consent setting without any regard to whether exigent circumstances exist to support a warrantless blood draw, penalizing those who refuse to be tested. *See McNeely*, 133 S. Ct. at 1566. *McNeely* itself looks favorably on this method of chemical-test enforcement, explaining that "all 50 States have adopted implied consent laws that require motorists, as a condition of operating a motor vehicle within the State, to consent to [chemical] testing if they are arrested or otherwise detained on suspicion of a drunk-driving offense." *Id.*

The short history and tradition of automobile regulation indicate that laws regulating automobile use have existed since the advent of the automobile. Automobile history is short; just over one hundred years ago, auto travel was so rare that operators of horse-drawn vehicles had the statutory authority to demand—by a mere wave of the hand—that any passing motor vehicle must yield until the horse-drawn vehicle passed, and an automobile driver's failure to stop when so signaled was illegal. *See Mahoney v. Maxfield*, 102 Minn. 377, 378–81, 113 N.W. 904, 905–06 (1907) (applying a 1903 Minnesota statute and surveying similar laws in other states). Even by the 1920s, cars remained so rare that police officers did not use them on patrol, relying instead on horses, bicycles, and the newly introduced motorized cycles. *See Edberg v. Johnson*, 149 Minn. 395, 398,

184 N.W. 12, 13 (1921) ("As an aid to officers on patrol duty no vehicle more serviceable than the motorcycle has as yet been invented. Of course it is possible for such officers to use automobiles instead of motorcycles, but their use would be equally if not more dangerous to others if driven at a high rate of speed.").

But while relatively few cars were on the road at the advent of automobile transportation, the statutory prohibition against operating a motor vehicle while intoxicated developed in unison with the state's restrictions on issuing driver's licenses. *See, e.g.*, *Mannheimer Bros. v. Kan. Cas. & Sur. Co.*, 147 Minn. 350, 353, 180 N.W. 229, 230 (1920) (discussing Minnesota statute that "directs that no license shall be issued to excessive users of intoxicating liquors, and in another section expressly declares that it shall be a misdemeanor for anyone to drive while intoxicated"). In 1939 no "habitual drunkard" could be licensed to drive in Minnesota. *See* Minn. Laws. ch. 401, § 4(4), at 783 (codified at Mason's Minn. Stat. § 2720–144a(4) (Supp. 1940)). Within just 40 years of the onset of automobile-operator licensing, the United States Supreme Court recognized that chemical testing of suspected drunk drivers provides "a scientifically accurate method of detecting alcoholic content in the blood, thus furnishing an exact measure upon which to base a decision as to intoxication." *Breithaupt v. Abram*, 352 U.S. 432, 439, 77 S. Ct. 408, 412 (1957). And it observed that "[m]odern community living requires modern scientific methods of [drunk-driving] detection lest the public go unprotected." *Id.* at 439, 77 S. Ct. at 512. As recently as the 1980s, the Supreme Court saw no fundamental right for a suspected drunk driver

to refuse to be tested in the implied-consent setting, declaring bluntly, "Respondent's right to refuse the blood-alcohol test, by contrast [to a right rooted in the Constitution], is simply a matter of grace bestowed by the [state] [l]egislature." *Neville*, 459 U.S. at 565, 103 S. Ct. at 923.

Given the relevant history, it is clear to me that a suspected impaired driver's right to refuse drug and alcohol testing is not among those "fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition." In my view, nothing in this claimed right is "implicit in the concept of ordered liberty such that neither liberty nor justice would exist if [it] were sacrificed." This would lead us to test the statute under a rational-basis analysis, not a strict-scrutiny analysis, and the statute would easily pass muster.

### *Even under strict scrutiny, the statute criminalizing a suspected impaired driver's refusal to undergo a chemical test is not unconstitutional.*

Of course, this court is bound to faithfully follow supreme court precedent, including *Bernard*. Although I therefore reluctantly join the majority in accepting that *Bernard* implies that the United States Supreme Court decision in *Missouri v. McNeely* requires us to apply strict scrutiny in a substantive due process challenge to the state's chemical test-refusal criminal statute when blood has been requested, I believe the statute nonetheless survives strict scrutiny. I therefore dissent on this specific ground.

The majority recognizes that the state has a compelling interest at stake here, but I believe that it too broadly identifies that interest and, therefore,

mistakenly holds that the test-refusal statute fails to be sufficiently narrowly tailored. The majority correctly identifies only *part* of the state's compelling interest, which is its "compelling interest in highway safety that justifies efforts to keep impaired drivers off the road." But examining the statutory scheme more closely, I believe that the state's interest goes deeper because it contains a related complementary component. The statutory scheme evidences the state's interest not only in obtaining scientific evidence of the suspected impaired drivers' chemical impairment to facilitate accurate convictions to keep them off the road; it also evidences the state's strong interrelated interest in protecting suspected impaired drivers from being customarily subjected to forced blood draws by police, who have the constitutional authority to easily obtain a warrant and draw blood from every suspect.

Chemical tests are essential to securing impaired-driving convictions, which in turn allow the state to incarcerate offenders and keep them off the road. And as a practical matter, the only way the state can subject an unwilling suspected impaired driver to a chemical test is to draw the driver's blood; police have no apparatus to forcibly extract a person's breath or urine. The legislature is aware that, unless constrained by statute, police could draw blood after *every* traffic stop during which the officer develops probable cause (a very low standard) to believe that the driver may be impaired by drugs or alcohol. All the officer must do is smell an alcoholic beverage on the driver's breath or notice a slur in the driver's speech and redness in his eyes, and the officer could quickly obtain the

obligatory warrant. *See* U.S. Const. amend. IV (requiring probable cause for search warrants); Minn. Stat. § 626.11(a) (2012) ("If the judge is satisfied . . . that there is probable cause . . . the judge must issue a signed search warrant . . . ."); Minn. Stat. § 169A.20, subd. 1 (2012) ("It is a crime for any person to drive . . . any motor vehicle . . . when . . . the person is under the influence of alcohol."). The statute informs us that the legislature at once wants *both* a means to remove drunk drivers from the roadways *and* to avoid a police-state atmosphere where police, supported by an easily obtained warrant, routinely cart unwilling drivers to nearby hospitals or jails and direct the extraction of a blood sample for testing.

The state achieves its first objective of removing drunk drivers from the roadways by that part of the impaired-driving law that criminalizes both impaired driving and a suspected impaired driver's refusing to submit to chemical testing. Minn. Stat. § 169A.20, subds. 1, 2 (2012). The state achieves its related second objective of preventing police from routinely invading the bodily integrity of drivers by prohibiting police from drawing blood from unwilling suspects. The test-refusal law declares bluntly, "If a person refuses to permit a test, then a test must not be given." Minn. Stat. § 169A.52, subd. 1 (2012).

I would have no difficulty concluding that the state's interest in protecting its citizens from constitutionally permitted but legislatively intolerable police intrusion is a compelling interest. The nation's founders pledged their lives and fortunes and fought a revolution primarily to resist oppressive governmental power. *See* The Declaration of Independence para. 2 (U.S. 1776) (objecting to "a

long train of abuses and usurpations" in order "to provide new Guards for their future security"). Both the federal and state constitutional framers fortified "the right of the people to be secure in their persons . . . against unreasonable searches." U.S. Const. amend. IV; Minn. Const. art. I, § 10. And the people have perpetually negotiated the border between the public commitment to liberty and the law enforcement tendency to expand its policing power. The federal constitution establishes only the outer edge of that border and allows states to more tightly restrain police activity through constitutional and statutory law. *See California v. Greenwood*, 486 U.S. 35, 43, 108 S. Ct. 1625, 1630 (1988) ("Individual states may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution."); *Atwater v. City of Lago Vista*, 532 U.S. 318, 352, 121 S. Ct. 1536, 1556 (2001) (noting approvingly that many states "have chosen to impose more restrictive safeguards through statutes limiting warrantless arrests for minor offenses").

This state has exercised that right to restrain its police more tightly than the federal Constitution. The supreme court has, on several occasions, interpreted the state constitutional language that echoes the Fourth Amendment more restrictively than the way the United States Supreme Court interprets the Fourth Amendment. *See, e.g.*, *Ascher v. Comm'r of Pub. Safety*, 519 N.W.2d 183, 187 (Minn. 1994) (holding that the Minnesota constitution prevents the operation of suspicionless road blocks despite the U.S. Supreme Court's holding in *Michigan Department of State Police v. Sitz*); *State v. Askerooth*, 681 N.W.2d 353, 362–63 (Minn. 2004)

(declining to follow the U.S. Supreme Court's decision in *Atwater v. City of Lago Vista*, and holding that the Minnesota Constitution requires a reasonableness limitation on the scope and duration of a *Terry* detention); *In re E.D.J.*, 502 N.W.2d 779, 783 (Minn. 1993) (declining to follow the U.S Supreme Court's decision in *California v. Hodari D.* and holding that under the Minnesota Constitution a totality of the circumstances test applies to determining whether a seizure has occurred). And the people of the state, through their elected representatives, have here enacted a statute that restrains police activity even more restrictively than the principles of their constitutions. Particularly, in the same chapter the legislature requires each suspected drunk driver to submit to a chemical test when an officer requests one, Minn. Stat. § 169A.51, subd. 1(a) (2012), it correspondingly establishes that "[i]f a person refuses to permit a test, then a test must not be given." Minn. Stat. § 169A.52, subd. 1. The two linked provisions, only working together, serve the compelling complementary state interests of keeping drunk drivers off the road *and* keeping police from carting off every driver who smells like beer for forced, truly nonconsensual blood extraction. The majority's framing of the state's interest does not take into account the interrelated second component of the law.

I also would have no difficulty concluding that the state's complementary law is narrowly tailored to further the state's interest in protecting citizens from constitutionally permitted but intolerable police intrusion while most effectively removing impaired drivers from the roadways. I see no other means for the state to

accomplish this dual objective. The majority suggests three alternatives, but they are clearly inadequate.

Of course the state could, as the majority first suggests, "offer a breath test [instead of a blood test] to a suspected drunk driver and then, if the [breath] test is refused, the state may charge the person with the crime of test refusal." But a breath test reveals only the presence of alcohol, not any of the myriad controlled substances that also cause the impairment that the impaired-driving statute criminalizes. *See Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 625, 109 S. Ct. 1402, 1418 (1989) (observing that "breath tests reveal the level of alcohol in the employee's blood stream and nothing more"). The majority's first alternative to the current statute therefore does not meet even the majority's partially framed compelling state objective of keeping impaired drivers off the road.

The majority suggests second that the state could instead prosecute the arrested driver without the benefit of any chemical test at all. This also is no solution because it both weakens prosecutions and jeopardizes the innocent. Chemical test results arm the jury with forensic evidence without which more innocent drivers would likely be convicted and more guilty drivers would certainly be acquitted. Over half a century ago the Supreme Court recognized this, observing that, as to the guilty, a blood test "is a scientifically accurate method of detecting alcoholic content in the blood, thus furnishing an exact measure upon which to base a decision as to intoxication," and as to the innocent, "the [blood] test likewise may establish innocence, thus affording protection against the

treachery of judgment based on one or more of the senses." *See Breithaupt*, 352 U.S. at 439, 77 S. Ct. at 412. The majority's second suggestion would at once make Minnesota's roadways less safe and the evidence admitted in its impaired-driving trials less accurate.

The majority's third suggested substitute for the criminal test-refusal statute is simply that "police can secure a search warrant to test the person's blood." The majority is correct that police can indeed secure a search warrant to test every nonconsenting, suspected impaired driver's blood. The majority fails to notice, however, that this is exactly the harm the statute attempts to avoid. Police could obtain a warrant in every stop in which the statute authorizes an officer to request a blood test because the same low standard—probable cause—allows police to either request a test under the statute or to obtain a warrant to draw blood. *See* U.S. Const. amend. IV (requiring probable cause for search warrants); Minn. Stat. § 169A.51, subd. 1(b) (2012) (requiring probable cause of impaired driving for officer to request a chemical test). So although the majority's urging police to use the full measure of their constitutional authority to obtain an easily secured chemical-test warrant continues to facilitate impaired driving prosecutions, it undermines rather than furthers the other component of the compelling interest that the statute protects. The difference between the current scheme that the legislature has adopted and the scheme that the majority now suggests to replace it is that, under the legislative scheme, the suspected impaired driver *always* has the choice to refuse a blood test, but under the majority's scheme, the driver *never* has

the choice to refuse a blood test. We can predict that prosecutors and police will soon follow the majority's suggestion in every case, because it will be the only remaining reliable means to always secure the evidence necessary to incarcerate impaired drivers and protect Minnesota's roadways.

To understand why the majority's three alternatives to the test-refusal statute fail to satisfy both aspects of the state's compelling interest is to understand why the statute is precisely tailored to achieve the dual interests it addresses. I cannot conceive of any arrangement more tightly fitted to the statute's objective to remove impaired drivers from the road by potential incarceration *and at the same time* to protect suspected impaired drivers from being routinely subjected to forced, nonconsensual blood draws by police. Under the statute, the public is best protected from the dangers of impaired drivers because in every case the state will obtain either the necessary evidence to pursue an impaired-driving conviction or the necessary evidence to pursue a similarly weighted test-refusal conviction. And this protection occurs while every driver retains the absolute liberty to reject a blood test altogether, because, if he does, "no test shall be given." Everyone wins.

But after today's decision, police should never merely request a blood test, because if they do, upon refusal, not only is no test permitted, but also conviction is far less likely. Every police officer doing her duty to gather evidence to ensure the criminal conviction of apparently drug-impaired drivers has but one remaining course: give the driver no choice; call a judge every time; get a warrant every time; and administer a blood draw (the most invasive and costly of the three types

of chemical tests) if necessary by force, every time. The state will continue to obtain its evidence to convict and remove impaired drivers from the road, but it will cost the people their significant statutory restraint on police power.

The majority therefore gives the defense bar a hollow victory: today one suspected impaired driver escapes his conviction for exercising his supposedly constitutional right to refuse to consent to a blood test, and tomorrow every suspected impaired driver has effectively lost the right to refuse to consent to a blood test.